May it please the Court, Stephen Rosenbaum for Fox Insurance Company. I gather you want to argue these separately. You want to argue these cases separately. Well, Your Honor, I actually think that it might make sense for me to start with the termination case, which is the second case. Yes, it does. It would make more sense. And so we will take them actually in the opposite order that they appear here, if that's okay. Is that okay with you? Yes. Okay. Fox Insurance Company is the only Medicare Part D sponsored ever terminated without the opportunity to engage in corrective action under the provision that was applied against it. And we challenge that termination and its legality. Fox had operated as a sponsor starting in 2006 and successfully for four years. In September of 2009, receiving lavish praise from CMS, the governing agency, complimenting Fox for its solid policies and procedures, the quality and timeliness of its service, and it being well versed in CMS requirements. Nonetheless, in March of 2010, only a few months later, without the opportunity for corrective action, and I think it's fair to say in a great deal of suddenness the agency was given some opportunity for corrective action. And the agency just thought it was too catch-as-catch-can, a little too late, not adequate. Not at all, Your Honor. What happened was Fox in February of 2010 received intermediate sanctions, and that permitted it to submit a corrective action plan, but that occurred on February I'm getting the exact date. On February, the thing heated up in February and March, which is fairly fast, but it's not as though they had no notice. They had notice in, I think it was February, and by middle of March they hadn't cleaned up their act. But the time period to submit a corrective action plan had never even arrived by the time they were terminating. And the thing is, the things they were doing struck the agency as just too outrageous to let it go on because of the danger to life. Well, and we have several challenges as to the correctness of that determination. Let me ask you about one of them that particularly bothered me. All right. It looks as though they were using a list of drugs where they covered the prescriptions that was based on what the FDA had approved the drug for use on. What they're supposed to use is a different list that is broader and includes accepted off-label uses. Now, many, many drugs are used off-label. Some, the prescriptions are more for off-label than on-label uses because the process of getting FDA on-label approval is so expensive. For example, innumerable anti-convulsants are used for other psychiatric conditions rather than epilepsy. Avastin, an anti-cancer drug, is used for macular degeneration. And these are accepted uses, very frequent prescriptions, and it looks like Fox was just using the wrong list. And there's no ambiguity about what list it's supposed to use. I don't see why that could last a day. Well, let me say that the particular examples Your Honor points to actually would be protected class drugs, and I don't believe the issue you've presented would apply as to them, because those you're required to provide under any circumstance when someone has already taken that drug. They're on the six sacred drugs list. Yes. They're those six drugs where you don't fool around, you fill it and argue later. But I think Fox was even arguing about those before it filled them. Well, to be a little more precise, if you are already taking the drug, then you fulfill that prescription regardless. And that's the main point. But not if it's new. Excuse me? But not if it's a new. Not if it's a new one unless it's an antiretroviral, an AIDS drug. Unless what? If it's an antiretroviral drug, an AIDS drug, then you get it, period. It doesn't matter what you get. The thing about the antidepressants, which were on the six sacred drug list, you're looking at a suicide risk if you don't treat that before the depression gets too deep. And it looks like Fox was turning people down. Well, what the record, I believe, indicates were there were two different lists being used. One of them was the improperly narrow list, and as soon as that issue was pointed out to them, they corrected it and adopted the correct list. But my understanding is that what ultimately triggered the immediate termination was they went in to do an audit or to look what, and they discovered that Fox had nothing, it had no internal structure at all to figure out what it was doing or who was doing what or deal with internal complaints. There was basically no structure. Was that essentially what they found? Well, I think that exaggerates what they had found, and I think what they had found has to be also compared to what they had found as recently as September 2009, where they had made, as I say, fine enough solid policies and procedures. But they weren't actually there seeing what they had seen. They had paper, but when they actually went to see what was going on underground, they discovered that there was no structure. I believe those involved in person audits, too, the September 2009 ones. I don't know. You know, there's an underlying issue here where I really don't see your argument. And you better take your opportunity to educate me so I understand it better. It looks to me like Fox's posture is we don't have to follow any of the rules till you catch us, and then after you catch us, you can't do anything about our contract until you give us a fair opportunity to start doing things right on the thing you caught us on. And the other things, we'll just keep doing them contrary to the rules until you catch us on those. I don't think that's a fair characterization of facts. As an example, there were a variety of issues that CMS had identified in February, which, as the record indicates, Fox had solved immediately, long before the auditor showed up the first week of March. As an example, the government in its brief makes a good deal of the facts. Well, let's go back to the list. The list, strikes me, is something, it's kind of obvious which list to use. And they just used the wrong list, which would save them a lot of money till they got caught. There's no evidence. I don't see why they should get a chance to cure that problem. I don't see why they shouldn't be fired immediately for using the wrong list. You can solve that problem immediately, then, from a perspective. Well, they shouldn't have the problem. It's kind of like if you have a contract to build your house, and you specify all Bosch electronics, and your contractor has been using some cheap substitute instead of the Bosch electronics. You fire them now. You don't say, well, okay, let's cure this problem, even though you just intentionally used the cheaper kind of electronics, and then we'll see if I catch you on something else. Your Honor, and this is people's lives, it's not their houses. Your Honor, in part, your questions are getting, of course, to the question of disparate treatment, which is one of our bases for seeking reversal of determination. No, my questions are not getting at disparate treatment. They're getting on, why do you have to get caught and get an opportunity to fix what you were caught on? Why, when you're caught on something that's – there's no reason why you should have been doing it wrong, can't you be fired right now? Well, I think disparate treatment does go to the question of whether other people who engaged in similar behavior were or were not subjected to immediate termination, and the law does require that there be a valid explanation provided for the disparate treatment. We have recited in our papers, and this is simply a recitation of the findings CMS has made themselves with respect to these other entities, that they had, in many cases, gone on for years with multiple citations, and indeed, multiple opportunities to submit corrective action plans, which they had not lived up to. I would imagine that a bigger insurance company would have more occurrences when something mistaken was done. Well, I mean – But the big difference is mistaken or on purpose. Aetna made 125,000 mistaken rejections of prescriptions. That is – they may be a bigger insurance company, it's true, but that is a description that doesn't fit FOX. Health Net, which is one of the other entities that we point to, was found to have – were any of them doing anything that looked like it was intentionally taking risks to patients' health in order to save money, or was it just mistakes? Well, for Health Net, there was an explicit finding that the enrollees were being subjected to imminent and serious health risks, and a finding – On purpose or accidentally? Well, after 26 notices of noncompliance and four warning letters, I would reach the conclusion that if you're still not in compliance at that point in time, you're either not caring or intentionally doing it. Is this an equal protection argument? It is that there has to be an adequate explanation provided before people who are engaged in similarly situated entities. Well, the district court rejected your contention that these were similarly situated and went through each one of them. Now, where was the district court? The district court was wrong because it distinguished Health Net on the ground that he said as to FOX there was a determination made. They didn't think that FOX had the capacity to address the issue. And yet with Health Net, the specific finding was that they were significantly impaired with respect to their ability to administer their formulary, and they were lacking an effective program. And they had done this for years. Where is the authority that says that disparate treatment is wrong? I know prosecutors in criminal cases often don't prosecute a lot of offenders, and then they find somebody that they choose to make an example of or they change policy, and that person gets prosecuted. And that seems to be fine under the law. What's the difference? Well, the government has unfettered discretion not to start a prosecution at all. That's clear. But once an administrative action is initiated, there is an obligation to treat the same people. Where does it come from in this? I mean, the prosecution can prosecute one person for possession of marijuana and ignore all the millions of others. Well, I mean, probably the decision most on point would be the Kalo decision, C-A-I-O-L-A decision, which is admittedly from a different circuit, the D.C. circuit, but there it was very similar. It was a question of whether people should be debarred from government contracts based upon certain conduct. And the D.C. circuits, and two of them were, and one of them wasn't, and They were parallel? They were, yes. Yes. But, and the court said that there has to be an explanation provided for the disparate treatment. They were all being, I thought in that case that they were all roughly contemporaneous. It was, it was, well, the court, the, I, I, this sounds a little, you seem to be arguing that once the government goes down one track, which we're really talking about here, goes down one track with one defendant and then says, well, we shouldn't have done that, we're going to go down a different track with this guy, that they can't do that. But once they do it, they're stuck treating everybody exactly the same. There, there has to be a legitimate explanation provided, an adequate explanation provided. Why, what law says there has to be a legitimate explanation provided? Well, the D.C. circuit itself is implicit in the arbitrary and capricious stand. It's the arbitrary and capricious stand. Do you have anything other than, do you have anything other than CAOLA? Well, yeah. I think Los Angeles v. Shalala stands for the same proposition as the Was, was the HealthNet, was the HealthNet thing going on at the same time? Yes. I mean, the, the, the, I mean, yes, in the sense, I mean, the, the, the letter that we're quoting from is the same year. It's later that same year. But HealthNet had, according to CMS, engaged in this conduct for years. That's the phraseologies I used, for the past several years. So absolutely, this conduct predated Fox's and continued afterwards, according to the CMS's own, own formulation. So, basically, you had a couple of other arguments in your brief, but as I understand it, your main argument on this issue is the disparate view. Not, I do want to get back to my first argument, which is simply that the regulation against which we were terminated is unlawful. I mean, that's a very, that's a, that's a legal issue. It has nothing to do with the facts, per se. The statute, the statute But they didn't rely on it. They relied on the statute. They can't, they can't, because the statute, this is an unusual statute, perhaps. I'm not sure how common they are. But in any event, the statute itself says, explicitly, and this is Section 1395HHA2, says no rule or requirement that establishes or changes a substantive legal standard governing eligibility deferred services shall take effect unless promulgated by regulation. So unless there's a valid regulation, there is no basis to terminate Fox, regardless of whether the statute itself might have provided a standard to do so. So that's requirement number one. And then requirement number two is the provision under which Fox was, the regulatory provision under which Fox was terminated, which is 423.509.85. But this isn't a substantive legal standard governing the scope of benefits, the payment for services, the eligibility of individuals. It's a procedural standard about when you can It's the substantive standard as to what it is we have to have done in order to be terminated. That's a substantive standard. There's process that follows based upon the substantive standard. That's true. But the substantive standard is the requirement that we have that should have been in the regulation but wasn't, was that there would be an imminent risk that's serious to enrollees, plural. All three of those requirements are left out of the governing regulation. Okay. Thank you very much. We'll give you a two-minute rebuttal. Thank you. Good morning, Your Honor. Saurang Dombly for the United States. Since, you know, since I think my colleague has sort of talked about antiretroviral drugs and how important they are, I just wanted to, if I might, just describe a letter that CMS received that led it to conduct its further investigation. And the letter is reproduced in the supplemental excerpts of record produced by the government at page 7. And it reveals what turned out to be, unfortunately, an all too common experience with Fox's insurance practices. So the letter is from the Orlando Immunology Center. And it recounts that the center had contacted Fox on behalf of one of its patients. The patient was HIV positive and receiving treatment with a particular antiretroviral drug. And the patient had gone to a Walgreens to fill his prescription and was denied based on an improper preauthorization requirement that was interposed by Fox Insurance Company. And as my colleague pointed out, that was the kind of drug for which they could never impose a preauthorization requirement. And that very day, within hours, the immunology center contacted Fox's pharmacy support help desk and explained the urgency of the situation. And as the letter recounts, it said, quote, due to patient's HIV positive status, this medication must be taken daily with no break in therapy. And they were assured by Fox, again, this is quoting from the letter, quote, we were assured this request would be reviewed within 24 hours. Now, that didn't happen. The immunology center contacted Fox Insurance again on the next day, January 14th. I still don't know the story. I couldn't find it. Where is it again? It's in the supplemental excerpts of record that the government produced. So it's a small volume that has the government's signature on it. And so on January 15th, again, the immunology center contacted Fox and again received no response. And finally, on January 18th, five days after they'd made their initial request for this drug that needs to be taken daily, they got the required authorization. And so CMS did its further investigation, and it revealed that CMS, Fox had serious compliance difficulties. That's what the that's in the words of the agency, serious compliance difficulties. Fox's own compliance officer admitted to CMS investigators that Fox, quote, had no compliance plan or structure in effect. It had no procedures to internally audit or monitor compliance. It had no written compliance policies, no compliance training program. These are all specific requirements laid out in the regulation. And so the agency had ample basis to conclude that Fox was not in substantial compliance with Medicare Part D regulations, and the termination was entirely improper for that reason. And incidentally, was my understanding of the record correct, that they used the wrong list for what drugs they would cover? Absolutely, Your Honor. And this is at 210 of the excerpts of records. The statute itself specifically sets out the two drug compendia that Fox Insurance must use. It's not there's no question about which compendia must be used. It's obvious. And on 210, the agency explains that CMS discovered in its audit that Fox had 455 improper preauthorization denials of one drug, this drug Lyrica, which is an anticonvulsant, which is one of the drugs that I believe you had mentioned, Your Honor. And Lyrica had only four medically improved indications on the label, but the drug compendium listed an additional eight uses. And so that's exactly the kind of – and this was just one of a series of reports that Fox had made, a series of violations of Medicare Part D regulations that Fox had committed. So really, there's no – and these facts, by the way, I point out, are undisputed. Am I correct that the legal argument administratively was a little different in that the argument was that they could only be terminated on this fast track if they – because of financial difficulties? There was a little bit, yes. There was a different spin on the argument that was abandoned. And did they argue the disparate, so-called disparate treatment issue before the agency? Not, Your Honor. They argued it in the context of – they pointed – they did point out sort of the other – they cited the letters that they have in their excerpts of record, but they did it in the context of saying that the agency's interpretation of its own regulation was improper, it wasn't as sort of as it is in this Court, a separate claim. So, I mean, you know, they've cited the parts of the record that they believe show that there was a disparate treatment. I would just point out that, look, the real question for this Court is whether the agency is acting beyond the scope of its regulatory authority. And so, you know, how we treated other, you know, different – other insurance companies in different circumstances is not really relevant to that question. Kennedy, is there evidence that anyone died because they didn't get the drugs? In this case, I don't think there was evidence of that. But what the chief medical officer of CMS said was very clear, was it created the potential for life-threatening – a life-threatening situation, particularly with the kinds of drugs that we were talking about. I was just wondering if there were any deaths. No, there weren't deaths, although there were, you know – Let me ask my question. I'm sorry. I apologize. If there were any deaths on account of violation of regulations by Fox Insurance Company, can I infer that the agency would report those deaths to the appropriate prosecutorial authorities for possible manslaughter indictments? I can't say – I can't answer that, Your Honor. To be honest, I don't know. Does the agency have a system in place to address that? I apologize, Your Honor. I simply don't know the answer to that question. Well, what about – I mean, is your basic argument that it doesn't matter at all whether there was – whether other companies were treated otherwise, or is it that there were – I mean, there's sufficient discretion here that, you know, as long as there's some difference, that's good enough? Yeah, there – I think – I think it's more the latter, Your Honor. I think there is sufficient discretion here. You know, under principles, you know, like the court – the principles of the Supreme Court described in Heckler v. Cheney, you know, the agencies have broad discretion to determine sort of what levels of enforcement to take. And so it's difficult sort of here on the cold paper record that we've got to compare these various cases and say, well, you know, that they're – that they're the same. And the other one had none. I mean, that seemed to be the difference. Yeah. Well, Health Net, all the agency found that there was – was that there was an ineffective compliance program. Here, they had virtually – they had no compliance program. Their own compliance officer, the person they called their compliance officer, said that they're admitted during the audit that there was no compliance plan or structure in effect. Given the seriousness of the – Does compliance in this context mean that if a pharmacist calls up, whoever he gets on the phone says, yes, that's approved, and a program is training the people who answer the phone for how they're supposed to decide whether to say yes? Yes. That encompasses all of that, Your Honor. And they found that the drug approval process was broken, that the fact that they didn't have a training plan. There are two ways I – or actually, three ways I know of that drugs get approved. One is the pharmacy just types it in and gets back something on the computer so that it gets paid. The second is the pharmacy types it in and gets something back on the computer saying call, and they call. And the person at the other end of the phone asks a couple of questions and then says yes or no. And the third way is the pharmacy types it in, gets a message back on the computer screen that says preapproval required, and that usually means that the doctor has to talk to the insurance company or the patient has to ask the pharmacist to send the insurance company some message, and then weeks or months later, the pharmacy tells the patient it's been approved or the insurance company tells the patient it's been approved. Is that the way it works? Yeah, that's my understanding of the general way that it works when you walk into a pharmacy. There are various ways that the drugs can be denied. And what would happen here is sort of the third option was being put into place for drugs like antiretroviral drugs, antineoplastics used to treat cancer. Well, you're not supposed to do that. You're supposed to get the drug now and argue about it later. That's the way it's supposed to work, and it didn't work that way. And it was unsurprising once CMS did its audit, the reason why it wasn't working that way. CMS had no internal auditing or monitoring. I think they also – I think it also worked that way because they had a rule they imposed that if it was going to cost more than $1,500, they wouldn't approve it. Isn't that right? They also did have, yes, Your Honor, they also had improper high-cost edits or miscoded high-cost edits. So, you know, they just had a whole series of issues. And because of the – A lot of these drugs, especially the cancer drugs, but even a lot of fairly routine ones like anti-ulcer drugs, often cost more than that. I imagine that's right, Your Honor. And the reason for immediate termination in this case was because once CMS did this investigation, they had no confidence that CMS, that Fox Insurance Company would be able to fix these problems or any other problems that might happen in the future. Let me ask you about the regulatory structure. If I understand Fox's argument with respect to the invalidity of the regulation, it is that you are adding the regulation-added power that the statute didn't give in terms of being able to terminate when there was an immediate health risk or something like that. And the regulation has now been changed, as amended. Is that the case? The regulations went through a sort of wholesale restructuring, yes. And so they mostly to clarify that just to make – just to match, to map the regulation closely to the – So you use the word such now, and it's fair enough. Yes, Your Honor. Yes, Your Honor. And that happened since this termination. That happened just a few months after this termination. Yes, after this termination. So I guess my question is, are there – is this the only case where the challenge – as I understand it, the agency didn't interpret the regulation, doesn't interpret the regulation challenged here the same way that Fox does. Right. That's right, Your Honor. But am I correct that this is – there aren't any other cases in the pipeline where that kind of challenge would be made? No, because I believe that this is the only termination – The only one. – that's the only termination. And really – But the actual finding that was made was the finding required by the statute. Absolutely right, Your Honor. That is a very important point. And the Secretary's never interpreted this regulation to go beyond what the statute requires. I mean, I think the reference to a risk to health is an obvious reference back to the statutory standard repeated in the first clause of that provision. And that's exactly the way the Secretary interpreted it in this case. That's exactly the finding made by the Secretary in this case. And so I don't know where the – The argument is that it – that it – that it – the regulation actually goes farther, so therefore it's inconsistent with the statute. Even if that were right, and we don't think it is, the statute itself provides the agency ample authority. The statute that they rely on requiring the agency to make regulations only applies when the Secretary is establishing or changing a standard. In other words, the statute is set up so that many of the standards are not in the statute. That's right. But instead are established by the Secretary. It doesn't say if you're going to do something that's already covered by the statute that you should ignore the statute. That's exactly right. You don't have to care at the statute. Exactly right. Okay. If there are no further questions. Thank you very much. I have to give you a two-minute rebuttal. Thank you. On the question whether Fox waived their argument as to disparate treatment, we believe the record is clear. These particular treatments of other Plan D sponsors were explicitly addressed. And the argument was made that, and I'm quoting from Executive Order 64, this disparate treatment is not justified by CMS's stated basis for action in each situation and supports Fox's view that CMS has acted arbitrarily and capriciously. So I don't see any basis for the argument that we didn't raise the argument in below. On high-cost edits, I would, let me be clear on that, high-cost edits are per se lawful. CMS doesn't take a different position as to that. That is to say it's permissible to say that if a script is above a certain amount of money, you can require the pharmacist to make a call to confirm, yes, this is really the right script. It's not an error. For example, someone can then actually type in for 10 doses of something when they only met one or things of that nature. So that isn't the issue. It is true that until fixed, there had been a problem by our pharmacy benefit manager where they were sending an erroneous message when high-cost edits were, in fact, properly implemented. And pre-approval, when it was above $1,500 and what they should have done was give the prescription now and go through the process later if it was on the six sacred drugs and on a lot of others, it should not have been, not have required pre-approval if it was on the list, it's just you were using the wrong list. Isn't that right? No, not quite. Even for protected class drugs, it's perfectly legitimate to impose a high-cost edit to require that there be just a double-check confirmation, yes, this is wrong. You can double-check on the six sacred drugs. Just to make sure it's the correct. But the phraseology used to the pharmacist should have been high-cost edit. And unfortunately, the pharmacy benefit manager, Fox's contractor, until the issue was caught, was using a phraseology that seemed to indicate, in fact, it was a prior authorization situation. That is really what, that mistake is really the crux of the problem. And I recognize that there is legitimate concern about people having been delayed in cases and getting their drugs, but I, it's not just these three examples of Health Net and Aetna and the other that we point to. We also have put before the court the audit done of 11 Plan D sponsors where the, which CMS conducted itself and said that they found systemic errors and rejections of protected class drugs. And so, you know, one may wish that this system worked perfectly. One might wish that they were more aggressive with the other insurance companies, especially if anybody's dying of these delays. I'm sorry, I didn't quite hear the question. I said one might wish that the agency were more aggressive with other insurance companies if they're improperly denying drugs that people need for their life or health. Okay, your time is up. Thank you very much for your arguments. And now we will go to the next case.
judges: Schroeder, Kleinfeld, Berzon